J. L. CLARK v. RUTH WILBURN, et al.

Western Section. December 20, 1927.

B. F. Booth, of Memphis, for appellant.
D. B. Puryear, of Memphis, for appellee.

SENTER, J.   This litigation grows out of certain conveyances made by Alfred Clark, colored, deceased, to his daughter Ruth Wilburn, conveying to his said daughter certain lots or parcels of real estate situated in Shelby county, Tennessee.   It appears that the deceased Alfred Clark died intestate in Shelby county, Tennessee, on or about January 30, 1926.   Some years prior to his death he was the owner of a tract of land containing a fraction over twenty-four acres.   This tract of land was near the City of Memphis.   Several years prior to his death he sold off ten acres from the tract, leaving him the owner of fourteen and a fraction acres.

In the latter part of 1919 and in 1920, Alfred Clark gave to each of his living children a lot, ranging in size from about an acre and one-half to an acre and three-quarters.   He had had the property platted, and conveyed to each of these children the respective lots, so that they could each build homes on the respective lots.

For many years, nearly a half a century, Alfred Clark had been teaching school in the public colored schools, of Shelby county, Tennessee.   At the time of his death he was an old man, probably

seventy-five or eighty years of age, his exact age is not definitely shown by the record. After he quit teaching school he lived on this tract of land and had a small home on the tract. It appears that he desired to do something for each of the children and to settle them near him on this tract of land, and for this reason conveyed to each of them the respective lots. It appears that at or about the time the deceased conveyed to the other four of his children the respective lots or parcels, he conveyed to the defendant, Ruth Wilburn, a lot seventy feet fronting on Mendenhall avenue, running back east between parallel lines 286 feet. This lot did not include all of Lot No. 1. Lot No. 1, as shown on the plat, being seventy feet fronting west on Mendenhall avenue, and running back between parallel lines 331 feet. Lots 2, 3, and 4 also fronted on Mendenhall avenue, and each of these ran back 331 feet east between parallel lines. Between Lots 4 and 3 and extending from Mendenhall avenue east through the entire fourteen and a fraction-acre tract, there is an avenue shown on the plat thirty feet wide.

The deed conveying the portion of Lot No. 1 to defendant Ruth Wilburn is not attacked in this proceedings, as it seems to be conceded that at the time this conveyance was made the deceased was in possession of his faculties and capable of conveying his property. It also being conceded that at about the same time or shortly thereafter he conveyed to each of the other children the lots before referred to.

On December 22, 1920, Alfred Clark and his wife, who was then living, executed a deed to the defendant Ruth Wilburn, to two small parcels for the recited consideration of "$10 and other valid considerations to them in hand paid by the said Ruth Wilburn the receipt whereof is hereby acknowledged." The first parcel described in this conveyance is one-half of Lot No. 2 on the plat, being the south one-half of Lot No. 2 fronting sixty-one feet on Mendenhall avenue and running back 331 feet. The second parcel described in this conveyance is the east forty-five feet of Lot No. 1. This lot or parcel is forty-five feet east and west and seventy feet north and south, and is the remainder of Lot No. 1 first conveyed to Ruth Wilburn. This deed is one of the conveyances attacked in this suit, and will be later referred to.

In December, 1924, Alfred Clark executed a deed to the defendant Ruth Wilburn for the recited consideration of "$10 and other valid considerations to him in hand paid by the said Ruth Wilburn, the receipt whereof is hereby acknowledged," to an additional part of the fourteen and a fraction-acre tract. This parcel being 110 feet north and south at the west end and running back 649.36 feet to the east boundary of said tract, and being 121 feet at the east end. This lot does not front on Mendenhall avenue, but begins at a point 800 feet east of the east line of Mendenhall avenue, but is bounded

on the south by the thirty-foot avenue, which runs east and west through the entire tract from Mendenhall avenue to the east boundary of the tract. This avenue does not seem to have ever been opened and recognized as a street, unless probably the distance of Lot No. 4 of the tract.

This deed is another one of the conveyances attacked in this suit.

On July 20, 1925, Alfred Clark executed a deed to the defendant Ruth Wilburn for the recited consideration of "one ($1) dollar, love and affection, and the agreement by the party of the second part to support and care for the party of the first part during the remaining portion of his natural life," conveying another portion of the fourteen and a fraction-acre tract, which is 307.3 feet north and south and 400 feet east and west. This being a lot out of the southeast corner of the tract, and fronting on the thirty-foot avenue, unopened, above referred to. This conveyance is also attacked.

After the death of Alfred Clark four of his children, all married, filed the original bill in this cause, seeking to set aside all of the conveyances made by Albert Clark to his daughter Ruth Wilburn, except the first lot conveyed in 1919.

It is alleged in the bill that for several years prior to the death of Albert Clark he had been in bad health, and of weak mentality; that for two or three years prior to his death his condition, physically, was very bad and that he was confined to his home and bed the greater portion of the time; and that for three or four years prior to his death his mentality was greatly impaired, and to such an extent that he was mentally incapacitated to transact any business, or to know anything about his own affairs, and that he was an easy subject for imposition; that the defendant Ruth Wilburn, his daughter, intimidated him, and coerced him, and by undue influence procured him to execute the three conveyances, conveying the four pieces of property, and which conveyances the complainants sought to have set aside.

The defendants Ruth Wilburn and her husband, Jessie Wilburn, filed an answer to the original bill, and in which they deny all the material allegations, and deny that there was any fraud or deceit or coercion or any other improper methods used to induce Alfred Clark to execute the conveyances in question. The answer denies that Alfred Clark was of weak mentality, but admitted that during the later years of his life, he was in failing health, but was at all times in full possession of his mental faculties, and was of sound mind when he executed these other conveyances made the subject of this litigation. The answer claims that the consideration for the conveyance of December, 1920, was $75, which the defendant Ruth Wilburn paid to her father, and that her father at the time knew that he was selling the property to her at a cheap price. In this connection it is insisted in the answer that the strip of property

forty-five feet east and west by seventy feet north and south, being the east end of Lot No. 1 which had previously been given to her by the deceased only made her lot the full depth as the other lots adjoining and which had been given to the respective complainants, and that the first parcel described in that conveyance was really the property actually bought by her for the $75. All charges of fraud or undue influence, or mental incapacity in connection with that conveyance are specifically denied.

With reference to the second conveyance attacked, being the conveyance of December, 1924, conveying a strip 110 feet at the west end and 121 feet at the east end and 649.36 feet east and west, the answer states that this property and other property of the deceased was then under a mortgage or trust deed to Mr. A. W. Ketchum, of Memphis, whose indebtedness under the trust deed amounted to $287.50, and that the deceased was financially unable to pay this mortgage debt and to discharge the lien and that property and other property included in the trust deed, and procured the defendant Ruth Wilburn to pay off said mortgage debt to Mr. Ketchum and have the mortgage lien on the property under the trust deed discharged, and agreed with the defendant Ruth Wilburn that he would convey to her this particular parcel of land, and that in pursuance of his request she did pay off the mortgage debt to Mr. Ketchum, amounting to $287.50, and that the deceased, while in full possession of his mental faculties and with a clear understanding of the nature of the transaction, executed the deed to her conveying said property. The answer denies that in this transaction the defendants were guilty of any wrongdoing, or any fraud, or any imposition on her father, and denied that her father was mentally incapable of making the conveyance, and denied that he did not know what he was doing.

With reference to the conveyance of July 20, 1925, by which the parcel 307.3 feet north and south by 400 feet east and west off of the east end of the tract, the defendant denied that this deed was procured by any undue means, or by fraud or coercion or intimidation, and denied that Alfred Clark was at the time he executed said conveyance of unsound mind, or that his mental faculties were impaired or that he was mentally incapable of knowing his business and wishes, and that this deed was executed by him with full understanding and knowledge as to the provisions and conditions, and was the result of his own suggestion and proposition. The answer further sets up that the defendant Ruth Wilburn had complied with all the considerations mentioned in the deed with reference to taking care of her father; providing for him and furnishing his meals after the deed was executed.

At the hearing of the cause the Chancellor found, and so held and decreed, that at the time the first conveyance involved, the deed

of 1920, was executed by Alfred Clark he was then in possession of mental faculties and capable of executing the deed. This deed was sustained by the Chancellor as to both parcels conveyed therein, and to this part of the decree the complainants excepted and appealed to this court and have assigned errors. This being in the nature of a special appeal from only that part of the decree.

The Chancellor further found, and so held and decreed, that the conveyances of December, 1924, and of July, 1925, respectively, were executed by the deceased Alfred Clark at a time when his general condition of health and mind was much worse, and that although not of unsound mind to the extent that he was crazy, that his mentality had become greatly weakened, and that for the last few years of his life he was sick, feeble and childish, and that by December, 1924, he was in a condition and situation where he was unable to look after his own affairs, and unable to attend to his own person. To quote from the finding of facts by the Chancellor: "He was not crazy, but his mentality was far below par. He recognized his children and friends but was old and senile. He was confronted with an indebtedness to A. W. Ketchum and secured by a trust deed on 649.36 feet by 110 feet; 212 feet rear portion of 14.70 acres. J. L. Clark says the amount due Mr. Ketchum was $60 and some others say the same. Ruth says the amount due was $287.50. Mr. Ketchum was not produced as a witness."

The Chancellor further states that at the time this deed was secured Alfred Clark was physically almost helpless and his mentality was very low, and that this, coupled with the inadequate consideration shows imposition and fraud.

The Chancellor found, with reference to the deed of July, 1925, that at the time that deed was executed no consideration was paid; that "the old man's condition had grown constantly worse. His mind was not gone. He was not crazy. He was feeble and childish and bedridden. It was obvious that he could not last long. He had living with him his son, Gentry. J. L. Clark and Harrison Clark lived right by him. The wives of J. L. and Harrison were near to him and assisted in taking care of him. A woman by the name of Janie Smith employed and paid by Gentry, lived in the house and helped to look after the old man. Ruth, too, assisted in caring for her father. She would cook food and bring it to him. Now the consideration in the deed is the agreement of Ruth to support and care for the party of the first part during the remaining portion of his natural life." The Chancellor further held that the old man knew what he was signing, but was the victim of imposition, and that the agreement for support under the circumstances, "was a hoax," and that she did no more for the old man after the making of the deed than she did before.

By the decree of the Chancellor, the deed of December 22, 1920, was sustained, and the deed of December, 1924, and the deed of July 20, 1925, were set aside.

However, the Chancellor held, and so decreed, that with reference to the conveyance of December, 1924, that Ruth having satisfied and paid off the mortgage to Mr. A. W. Ketchum on that piece of property, that the old man intended to execute to her a trust deed on that property, and treated the amount paid by her to Mr. Ketchum as a loan, and ordered a reference to the Clerk and Master to ascertain the amount which she had actually paid in satisfying that indebtedness. The Master, in pursuance of the order of reference, reported that Ruth had paid the* $287.50, and that she was entitled to interest on that sum amounting to $41, or a total of $328.40. The Master also reported that the rental value of the property conveyed to her by the two respective deeds of December, 1924, and July, 1925, for the time she was in possession of the property covered by those conveyances, amounted to $40.65, leaving a balance in favor of Ruth of $286.75. The report of the Master was excepted to by the complainants, and the exceptions were overruled by the Chancellor, and he decreed a lien on the property conveyed by the deed of December, 1924, in favor of Ruth. From this part of the decree the complainant also excepted, and prayed an appeal to this court.

From so much of the decree as held that the conveyances made by Alfred Clark to Ruth Wilburn, dated December, 1924, and July, 1925, respectively, were void, and setting aside the same, the defendants have appealed. Both appellants have assigned errors.

The complainants have assigned errors to so much of the decree as sustains the conveyance of December 22, 1920, to the two parcels described in that conveyance. Complainants have also assigned as error the action of the court in overruling complainant's exceptions to the Master's report and confirming same, and the competency of certain evidence in support of the Master's report.

We will first dispose of complainant's assignments of error, and will do so collectively. The parcel described in the deed of December 22, 1920, as being forty-five feet by seventy feet is the rear end of Lot No. 1 which had originally been conveyed to Ruth. The other lots fronting on Mendenhall avenue were each 331 feet deep, and considerably more frontage on Mendenhall avenue. The plat shows Lot No. 1 to be 331 feet deep, but in conveying that lot to Ruth under the original or first conveyance it lacked forty-five feet of extending back the full depth of that lot, and we think it clear that in conveying this forty-five feet by seventy it only went to make her lot the full depth as other lots fronting on the same avenue according to the plat. We also think it clear that she paid $75 to her father as the consideration for the conveyance. The conveyance included also another parcel which is the south one-half of Lot No.

2 being about sixty-two feet wide by 331 feet deep. There is no evidence in the record as to the value of that property in December, 1920. There is some vague and indefinite evidence as to the value of the property in 1926 when the depositions were taken, and from which it appears that the property was worth on an acreage basis from $600 to $1,000 per acre, however this evidence is not at all satisfactory. This conveyance was made about the time the old man made the other conveyances to other lots to his other four children as a gift to them, just as he had given Ruth the part of Lot No. 1 in 1919. The Chancellor found, and we concur in the finding by the Chancellor, that at the time this conveyance was made, Alfred Clark was in possession of his mental faculties, and capable of making the deed. There is no evidence of any undue influence exercised by Ruth over her father in procuring that conveyance. We think there was no error in the action of the Chancellor in holding that conveyance to be good and in declining to set it aside. The other assignments of error by complainant on the matter of the action of the court in overruling complainant's exceptions to the Master's report, and in decreeing a lien in favor of Ruth will be disposed of in disposing of the assignments of error filed by defendants.

The first two assignments of error by defendants Ruth and Jessie Wilburn are with reference to the decree of the court holding the conveyances of December, 1924, and July 20, 1925, to be void and setting said conveyances aside. The other assignments of error by these defendants go to the action of the court in overruling defendants exceptions to evidence.

We will not undertake to discuss the several assignments of error separately in this opinion, as much of the evidence would be pertinent to both the conveyances which the Chancellor held to be void.

As to the conveyance of December, 1924, it appears that Mr. A. W. Ketchum held a trust deed on the property described in said conveyance and probably other property of Alfred Clark, securing an indebtedness of $287.50 including the accrued interest. At the time the Chancellor decided this case the deposition of Mr. A. W. Ketchum had not been taken, and his evidence was not therefore before the Chancellor at the time he decreed that this conveyance was intended to be a mortgage. J. L. Clark and other of the complainants had testified that Ruth had only paid $60 to Mr. Ketchum in the settlement of that indebtedness. Ruth had testified that she had paid $287.50. She testified that her father requested her to go to Mr. Ketchum's office with him and to ascertain the exact amount of the indebtedness, and that if she would pay the same he would convey this particular property to her, and that in pursuance of this request from her father she went with her father to Mr.

Ketchum's office and paid the amount which Mr. Ketchum said it would take to satisfy this debt, and that she paid this debt to Mr. Ketchum. She testified that Mr. Ketchum failed to calculate the interest at that time and sent for her to come back to his office, and she then paid him the interest, making the total amount $287.50. She testified that Mr. Ketchum delivered the note and the trust deed to her father and that he took them to his home and put the papers in his trunk, and that she had not seen the papers since. J. L. Clark, one of the complainants, testified positively that the indebtedness was only $60. After the reference was made to the Master on this subject, the deposition of Mr. A. W. Ketchum was taken and his evidence fully and accurately corroborated the evidence of Ruth Wilburn with reference to the amount of the indebtedness and that she paid all of it by check on the occasion that she with her father called at his office, and that she returned the next day and paid the additional amount which he had failed to include, about $12.50. She made this payment, the entire amount, out of her own money, and gave Mr. Ketchum a check for the $275, which she exhibited in court but does not seem to be in the record, and the next day paid him the difference, making the total $287.50. Objection was made to this evidence because the note and trust deed were not produced. Mr. Ketchum simply testified the amount of his debt and that it was paid by Ruth Wilburn and that at the time of the payment he surrendered the note and trust deed, and later satisfied the trust deed of record. This evidence was clearly competent. The value of this parcel of land at the time of the transaction is not shown by the evidence. While it appears from the depositions of some witnesses, who do not qualify as to their knowledge of market values of real estate such as this, and whose evidence is not at all satisfactory on this subject, that the property was worth from $600 to $1,000 per acre. The evidence is as to the value of the entire property. The particular property conveyed to Ruth for the alleged consideration of the payment of the Ketchum indebtedness and described in the deed of December, 1924, does not front on Mendenhall avenue. It is true that Alfred Clark some years previous had had a plat made of his fourteen and a fraction-acre tract which fronted on Mendenhall avenue, but only put one street on the plat, which is shown to be thirty feet wide, and without a name. It was never opened and used as a street or avenue at any time, except for a short distance from Mendenhall avenue east. The land was of poor quality. There were not improvements on this particular parcel.

We have examined with painstaking care all the evidence in the record with reference to the mental condition of Alfred Clark at the time he made the conveyances to his daughter Ruth of December, 1924, and July, 1925. The three brothers of Ruth testified as to

the physical condition of their father, as did also the wives of J. L. and Harrison Clark. We think it clear from the evidence of J. L. Clark, that but little credence can be given his testimony. The Chancellor stated in his findings of facts that J. L. Clark had discredited himself by his course of conduct and dealings with his father, and we fully agree with the Chancellor in his estimate of the value of J. L. Clark's evidence. The complainants, and other non-expert witnesses, were permitted to testify that Alfred Clark was not mentally capable of transacting business and looking after his own affairs in the latter years of his life. Neither of these non-expert witnesses stated any incidents, or acts, or facts upon which the conclusion was based. Exceptions were filed to the evidence of these non-expert witnesses by the defendant, on the ground that the witnesses had not qualified as required by law, in that they had not stated any act or conduct or specific instances upon which the conclusion of mental incapacity was based. The Chancellor, in overruling the exceptions, bases his action on the ground that the exceptions were not filed within the time required by the rules of the court. The rule of the court on that question is not made a part of the record. However, if it be conceded that the exceptions to this evidence were not seasonably filed, yet on an appeal from the decree of the Chancellor the case is tried in this court de novo. This evidence therefore will be considered in the light of the fact that the non-expert witnesses testifying for complainants on the question of the mental condition of Alfred Clark did not qualify to testify by stating any particular acts or conduct or incidents upon which they base their conclusions. The probative value of this evidence could not carry much weight. The burden of proof was on the complainants to show that the defendant Ruth procured the execution of these deeds by fraud, coercion or undue influence, and that Alfred Clark was not mentally capable of making valid deeds to the property, and was imposed upon by his daughter Ruth. It is significant that Macon Harrison, one of the complainants and one of the children of Alfred Clark and a sister of defendant Ruth, testified that she considered her father was mentally alright, and she testified that she thought his mental condition was sound, although he was physically feeble and confined to his bed a good part of the time.

Several witnesses were introduced by the defendant Ruth Wilburn, who testified on the subject of the mental condition of Alfred Clark at the time he executed the conveyances in question. Thomas W. Green, the Notary Public who took the acknowledgment to the deed of July 20, 1925, testified that he talked with Alfred Clark about the conveyance and about the contents of the deed at the time he took the acknowledgment, and that the old man seemed to understand fully the nature of the instrument and that he was

conveying the property to his daughter, Ruth, and that he seemed to know what he was doing and what he wanted to do, and as a concluding statement he was asked and answered as follows:

"Q. Was there anything to create any doubt in your mind to make you hesitate to sign this certificate of acknowledgment? A. Nothing whatever."

In this connection, it appears that this same Notary Public had taken other acknowledgments to other instruments for Alfred Clark on other occasions. About the time this conveyance of July, 1925, was executed, Alfred Clark executed a power of attorney appointing his son J. L. Clark his attorney in fact to attend to his affairs, and Thomas W. Green, the same Notary Public, took Alfred Clark's acknowledgment to that paper.

W. H. Foote, an attorney of Memphis, testified that he had known Alfred Clark a great many years and that they had been friends for many years. He testified that he prepared the deed of July 20, 1925. He states that Ruth, who he did not know at the time, brought a note to him from Alfred Clark, requesting him to pre-pare a deed by which Alfred Clark was to convey certain property to his daughter Ruth; that he did not prepare the deed at that time but went out to Alfred Clark's home to talk to him about it in person, and that Alfred Clark then discussed the matter with him and gave him instructions as to how he wanted the deed prepared, and a description of the property; that he returned to his office and prepared the deed and later Ruth came to his office and got the deed. He also testified that later he received another message from Alfred Clark calling his attention to a mistake in the description of the property and he thereupon prepared another deed and in which he corrected the mistake in the first deed as to the description of the property, but in all other respects the deed last drawn was the same as the first draft. This was the deed that was acknowledged before Green, the Notary Public.

This witness testified that from the conversations and discussions that he had had with Alfred Clark, he considered that he was fully capable mentally of making a deed and that he knew what he was doing and discussed the matter intelligently. At the time Foote was at the home of the deceased to see him with reference to the writing of the deed he was accompanied by E. R. Brake. E. R. Brake stated that he accompanied Foote to the home of Alfred Clark and was present and heard Alfred Clark discuss the matter with Foote, and that he discussed it intelligently, and seemed to know exactly what he wanted and what he was doing.

William Young, another witness for defendant, a minister, testified that he had been intimately acquainted with the deceased during the later years of his life, and that he discussed various subjects with Alfred Clark, religion, politics and the current happen-

ings, and that Alfred Clark discussed these subjects intelligently and appeared to be perfectly rational. To the same effect is the evidence of J. W. Mackey and his wife, Mamie Mackey, who knew the deceased for many years, were frequent visitors to his home up to the time of his death. The only expert witness as to the mental condition of Alfred Clark introduced by either party to the litigation, was Dr. E. N. Wilkins. Dr. Wilkins testified that he was the superintendent of the Royal Circle Hospital at the time Alfred Clark was a patient in that institution, which appears to have been in the year 1924. He stated that Alfred Clark was a patient at the Royal Circle Hospital for several weeks and that he attended him twice a day; that he frequently talked with him after he left the hospital and called to see him at his home, and that he regarded his mental condition good and that he was mentally capable of transacting his business.

The only witness that testified to any particular incident or conduct upon the part of Alfred Clark tending to show that he was mentally incapacitated was the witness A. W. Bobbitt, for the complainant. Bobbitt testified that about two years before the death of Alfred Clark he had a conversation with him in which Clark wanted to find or locate some woman who had previously been working as a stenographer in B. F. Booth's office, and that he told the witness that he wanted to give her a piece of property, and told the witness that if he would locate this woman for him he would also give him a piece of property. When this evidence is read in its entirety we do not think much importance can be attached to it. The circumstances under which the statement was made to the witness are not shown. He states that the old man did not mention how much property or what property he wanted to give to this woman, or his reason for it.

The conclusion we reach from all the evidence is that complainants have failed to show by a preponderance of the evidence that Alfred Clark was mentally incapable of knowing his mind, and of knowing what he desired to do with reference to his property, or that he was so weakened mentally and physically that he was an easy subject for imposition. Nor do we think that the record shows by a preponderance of the evidence that Ruth Wilburn resorted to any fraudulent or coercive or other improper methods in procuring her father to execute the two deeds now under consideration. She testifies intelligently and with frankness. She is corroborated by Mr. A. W. Ketchum with reference to the consideration paid for the conveyance of December, 1924. Mr. Ketchum is a well-known and highly reputable lawyer of the Memphis Bar. His deposition was not taken before the hearing of the cause, and not until the order of reference was made to the Clerk and Master, he did not testify with reference to the mental condition of Alfred Clark because that was not

an issue on the order of reference, but it appears that he was loaning Alfred Clark money from time to time, and having business transactions with him, and had taken the trust deed on this property, which conduct would negative the idea that he did not consider him a man of sound mentality.

The exact age of Alfred Clark is not definitely shown, but he was probably seventy-five to eighty years of age at the time of his death. For some years prior to his death he had been in bad health and feeble. He was suffering from a serious bladder trouble, which necessitated his going to the General Hospital first, and later he was twice a patient at the Royal Circle Hospital. After he returned home from the hospital the last time, he was confined to his bed the greater portion of the time. It is evident from the record that he had been a man of fine intelligence, a school teacher in the colored schools of Shelby county for about forty-five years. He had accumulated some property. Up to the time of his death, or shortly before his death, he discussed with intelligence the usual topics of the day, and religion and politics, etc.

As was said in Seat v. McWhorter, 93 Tenn., 542: ''The law does not require that persons shall be able to dispose of their property with judgment and discretion in order to the validity of the conveyance. It is sufficient if they understand what they are about.''

In the same case it is further said: ''The fact that grantees advised and encouraged the execution of the voluntary conveyance does not impair the validity of the instruments unless the fee agency of the grantor was destroyed.''

We are constrained to reach the conclusion that the learned Chancellor was in error in holding that the conveyances of December, 1924, and of July, 1925, were procured by the defendant Ruth Wilburn by fraud, coercion, undue influence, or other improper means. We cannot agree to the conclusion reached that Alfred Clark was mentally incapable of knowing his wishes, or of understanding the nature of the transactions by which he conveyed this property to his daughter Ruth. We cannot agree to the conclusion reached by the Chancellor that the conveyance of December, 1924 (covering the property under mortgage to Ketchum), was intended as a trust deed to secure a loan which Ruth was making to him. Alfred Clark was without any money. He did not have any source of revenue. He did not derive any income from his property. He had no means of paying the Ketchum debt. In this situation we think it entirely reasonable that he was willing to convey that part of the property to his daughter Ruth if she would pay off the indebtedness to Mr. Ketchum.

We think the most serious question is with reference to the consideration for the conveyance of July 20, 1925. This conveyance was made when the old man was confined to his bed. He had re-

turned from the hospital. He had at this time become practically bedridden. While he seemed to have been in possession of his mental faculties, and we think by a preponderance of the evidence, knew and understood what he was about when he made this conveyance to his daughter Ruth for the consideration that she would take care of him, and provide for him for the remainder of his life. We do not think that he had in mind going to Ruth's home. She lived within a few yards of him. We think it evident from the evidence of the attorney, Foote, who prepared this deed, and also from the evidence of Thomas Green, the Notary Public, who took his acknowledgment to this deed, that the old man was much concerned about being taken care of for the remainder of his life. This seemed to be uppermost in his mind at that time. He especially requested the Notary Public to read over to him that particular clause in the deed, and otherwise expressed his interest in that particular clause. The only question remaining, is whether or not Ruth Wilburn, in good faith carried out the condition upon which the consideration for the deed rested. There is some conflict in the evidence on this question. It appears that she did prepare and take to her father the most of his meals after the deed was executed. He did not stay in her house. Her brother Gentry was living in the house with him at the time of his death, and in fact all the time after the deed was executed to Ruth. For some months prior to the time that Alfred Clark executed this last deed Gentry had been living in the house with him, and had employed a negro woman to live in the house with them as a housekeeper. Just what her exact status in the household was is not entirely clear. By the cross-examination of both Gentry and this woman it is sought to make it appear that their relations were not proper. There is some other evidence in the record to that effect. It does appear from this woman's evidence that she left there in August, 1925. This was shortly after Alfred Clark executed the deed. While it is true other of his children were frequently at the house to see him and assisted in waiting on him and caring for him, especially shortly before he died, we are of the opinion that by a decided preponderance of the evidence the main responsibility of caring for the old man rested upon his daughter Ruth. She prepared the most of his meals, and was evidently more attentive to him than the other children. We also think that the record discloses that Ruth was his favorite child. He seemed to rely more upon her than his other children. She was the only daughter who lived near enough to give him any personal attention. His other daughter, Macon, did not live near enough to give him any attention except to occasionally go to see him. The wives of the two brothers who lived near him seemed to have given some attention to him, but certainly not to the same extent as did Ruth.

60

After a very full and careful consideration we reach the conclusion that Ruth carried out in good faith and in a reasonable way the condition made the consideration for this conveyance. We are of the opinion that both these conveyances must be sustained. Having reached this conclusion it is unnecessary to consider the assignments of error of complainant on the matter of the action of the Chancellor in overruling the exception to the Master's report.

It results that the decree of the Chancellor in setting aside these two conveyances is reversed. The action of the Chancellor in sustaining the conveyance of December 22, 1920, is affirmed, and complainant's assignments of error are overruled. The cost of the cause and of this appeal will be taxed against the complainants and sureties on the appeal bond.

Owen and Heiskell, JJ., concur.